UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
                              )
DANIEL B. McDONALD,           )
     Plaintiff,               )
                              )    CIVIL ACTION
v.                            )    NO. 10-10896-DPW
                              )
MICHAEL J. ASTRUE, Commissioner,  )
Social Security Administration,   )
     Defendant.               )
                              )
```

MEMORANDUM AND ORDER
August 15, 2011

Pursuant to 42 U.S.C. § 405(g), plaintiff Daniel McDonald appeals the final decision of the Commissioner of Social Security (the "Commissioner") denying his 2006 claim for a period of disability and Social Security Disability Insurance ("SSDI"). The Commissioner has moved for an order affirming his decision. After full consideration of the record, I will grant the Commissioner's motion and deny McDonald's.

## I. BACKGROUND

### A.  Procedural History

McDonald's claim was first denied on June 29, 2006, and was again denied on January 5, 2007, following reconsideration. (R. at 75.)  In both decisions, the reviewing specialists determined that his condition was not severe enough to be considered disabling. (R. at 83, 87.)  McDonald timely requested a hearing.

On December 6, 2007, he appeared and testified at such a hearing during which he was represented by counsel.[1]  (R. at 75.)

The Administrative Law Judge ("ALJ") issued an unfavorable decision on January 25, 2008.  (R. at 72.)  The Appeals Council denied review of the ALJ's decision on April 16, 2010.  (R. at 1.)  Consequently, the ALJ's January 25, 2008, decision is the Commissioner's final decision.

## B.  Medical History

McDonald, born in June 1955, married his second wife on November 21, 1986, and has four children from a previous marriage.  (R. at 110, 127.)  In his April 26, 2006, application for SSDI, he claimed that he could not work due to herniated discs in his back and lower neck, depression, anxiety, and numbness in his wrist and hand.  (R. at 136.)  He stated that these conditions limit his ability to work because he "cannot sit stand or walk for any period of time [and has] chronic pain at all times."  (R. at 136.)  He claimed on his application that he stopped working on July 1, 1985, due to "back problems."  (R. at 136.)  He responded "no" to the question "Have you ever been seen by a doctor/hospital/clinic/ or anyone else for emotional or mental problems that limit your ability to work?"  (R. at 138.)

---

[1]The ALJ's decision states that McDonald appeared and testified without assistance of counsel.  (R. at 74).  But, the transcript shows that McDonald was represented at the hearing. (R. at 14.)

He listed his current medications as cymbalta (depression), ambien and trazadone (sleeplessness), and xanax (anxiety). (R. at 202.) On a pain questionnaire submitted to the Social Security Administration ("SSA") on May 11, 2006, McDonald stated that he has "had bouts with depression for a long time. My therapist wanted me to make you aware of it. She thinks it is important to my file." (R. at 151.) He then disclosed a suicide attempt in 1983 and stated that "[s]ince then I have still been in depression." (R. at 151.)

In his appeal of the Commissioner's decision, McDonald rests entirely upon his claim of mental impairment.

## 1. 1983 Suicide Attempt

McDonald's first hospitalization was on January 29, 1983, when he was brought to the emergency room ("ER") in a coma due to an overdose. (R. at 212–13.) McDonald was twenty-seven years old at the time and had been "drinking heavily" when he took the pills. (R. at 212.) The report notes that he had a "history of 'mental problems'" that was "significant for depression." (R. at 212.) Dr. Bahrawy, a treating physician, "felt that [McDonald] was not suicidal, that it was a situational depression and would continue seeing the patient and his wife as an outpatient." (R. at 213.) According to further medical reports and McDonald's testimony, the suicide attempt occurred at a stressful time in his life when he was separated from his first wife and unable to

see his four children.  (R. at 289.)  McDonald testified that he had continued to see Dr. Bahrawy for eight months to a year but then stopped treatment of his own accord.  (R. at 35.)  He also testified that he may have taken Ativan briefly at that time. (R. at 35.)

## 2. Medical Record of Treatment for Mental Impairment

According to McDonald's medical record, he next reported feeling depressed during a September 22, 2004, appointment with Dr. Onassis Caneris of the New England Neurological Associates ("NENA").  (R. 247-48.)  He had begun to see physicians at NENA in March 2004 to address chronic back pain that had been aggravated by a November 2003 motor vehicle accident.  (R. at 249-50.)  Dr. Caneris reported: "He has progressive pain.  He does have depressive symptomatology.  Again, that is not to imply that that is the primary cause, secondarily, depression.  He had not had any depression before this."  (R. at 248.)  Dr. Caneris also noted that McDonald worked as a carpenter, but had not worked since the 2003 car accident.  (R. at 247.)  In a second evaluation on December 15, 2004, Dr. Caneris diagnosed cervical and lumbar pain, bilateral component of myofascial pain, and "some mild depressive symptomatology, but he is pleasant and cooperative, as usual."  (R. at 245-56.)  Dr. Caneris prescribed sleep medication, but did not treat the depressive symptoms.  (R. at 248.)

4

McDonald did not seek treatment for his depressive symptoms until the end of 2005.  On November 3, 2005, McDonald underwent an initial clinical evaluation by Fran Eisenman, a social worker at Arbour Counseling Services.  (R. at 289–96.)  The report states that symptoms of depression first appeared "2 yrs +" ago, and that he had received treatment twenty years prior in Lawrence, Massachusetts, which presumably refers to his treatment by Dr. Bahrawy at Lawrence General Hospital.  (R. at 289.)  With respect to alcohol abuse, the report notes that McDonald began drinking at age eleven and drinks three or four beers per night if he has money.  (R. at 291–92.)  Eisenman diagnosed McDonald with major depression recurrent and anxiety, cited his father's death as a stressor, and noted chronic back pain.  (R. at 295–97.)  His global assessment of functioning ("GAF") was 35.[2] (R. at 295.)

Beginning on November 11, 2005, McDonald attended therapy

---

[2]Clinicians use the GAF to rate the social, psychological, and occupational functioning of adults.  The GAF is a numeric scale ranging from 100 (superior functioning and no symptoms) to 1 (persistent danger of hurting self or others, suicidal, or persistent inability to take care of oneself).  The GAF considers both an individual's symptoms and the level of impairment of an individual's ability to function in several key areas.  According to the GAF scale, 61–70 indicates mild symptoms or some difficulties in functioning, 51–60 indicates moderate symptoms or difficulties in functioning, 41–50 indicates serious symptoms or a serious impairment in any one area of functioning, and 31–40 indicates an impairment in reality testing or communication or major impairments in more than one area of functioning.  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (Am. Psychiatric Ass'n ed., 4th ed. text rev., 2000).

with Eisenman twice per month and had a monthly medical consultation regarding his prescription medications, which he took for depression, anxiety, and sleeplessness. (R. at 143.) Eisenman's bimonthly reports chronicle McDonald's depression and anxiety, listing as stressors his father's death in 2004, difficulties with his grown children and brothers, tension with his wife, financial problems, and the status of his disability application. (R. at 285–88, 298–315, 348–54.) Eisenman's reports state that McDonald "struggles [with ]depression and anxiety which have been [an] issue for 25+ years and exacerbated by physical disability." (R. at 306.) The reports also discuss his previous alcohol abuse, noting that he "uses alcohol (beer) at times to reduce his anxiety." (R. at 307.)

### 3. Treatment for Physical Impairments

Despite the lack of medical reports of mental health treatment following the 1983 suicide attempt, the record includes a number of medical reports concerning various physical injuries. In June 1983, McDonald had surgery on his wrist to repair a lacerated artery and nerve resulting from punching a fish tank. (R. at 208–12.) In the 1980s, there are six more ER visits for blacking out due to alcohol consumption, back pain, an injured foot, a laceration due to a BB gun shot to the head, and a laceration to his hand from putting his fist through a window. (R. at 205–07, 214–27, 263–65.) A report from October 1984 or

1989 notes the injury is work related.  (R. at 206-07.)  In the
1990s there are five ER visits arising from sore ribs, back pain
and a numb leg, a swollen knee, an ear condition, and a rash on
his cheek that he said was due to contact with shrubbery where he
worked.  (R. at 228-31, 260-62, 266.)

McDonald's back injury and chronic pain became more
pronounced in the 2000s.  On June 19, 2002, he "fell of an
embankment @ work - rolled 14" down to nails and bricks,"
resulting in cuts requiring stitches.  (R. at 258-59.)  McDonald
completed an evaluation for worker's compensation on June 27,
2002.  (R. at 256-57.)  In November 2003, McDonald was in a motor
vehicle accident.  (R. at 254.)  His head hit the windshield, and
he presented at the ER on November 5, 2003, with a stiff neck and
back pain.  (R. at 254-55.)  On January 28, 2004, Dr. Malcolm
Murdock conducted a physiatry consultation, reporting symptoms of
headaches, neck pain, and low back pain resulting from the car
accident.  (R. at 238-40.)  Dr. Murdock noted that McDonald
"continues to work but has avoided doing the manual heavy labor
and is doing most of his time supervising at the job sites."  (R.
at 238.)  McDonald continued to experience chronic back, neck
pain, and numbness and received chiropractic treatment through
February and March of 2004.  (R. at 236-40.)  From March 2004
through December 2004, McDonald saw neurological physicians at
NENA regarding his ongoing back and neck pain.  (R. at 245-50.)

In his first consultation at NENA, there is no reference to depression, but he did present with "depressive symptomatology" in September 2004. (R. at 247-50.)

### 4. Examining Opinions

On July 28, 2005, before McDonald reported depressive symptoms to Dr. Caneris and began treatment at Arbour Counseling Services, Dr. Kevin Witham conducted a diagnostic evaluation in conjunction with an application for state disability benefits. (R. at 155-58.) Dr. Witham noted the 1983 suicide attempt and stated that McDonald "reported no other history of mental health treatment. He is resistant to obtaining mental health treatment and does not feel comfortable discussing mental health complaints." (R. at 155.) However, there is a note that McDonald briefly took antidepressants at one time but stopped because they were not helpful. (R. at 156.) Dr. Witham reports that McDonald's depression began "shortly after his original back injury about 15 years ago," which would have been approximately in 1990, and "[h]is depressive symptoms appear to be chronic and fairly mild in nature." (R. at 157.) McDonald told Dr. Witham "that his depressed mood has gradually built up over the years. He stated that he feels depressed all of the time, and that it has never gone away. . . . He did not report any episodes of major depressive disorder since the onset of his pain and depression about 15 years ago." (R. at 156.) According to the

evaluation, McDonald began experiencing panic attacks in January 2005, after his father passed away. (R. at 157.) McDonald also told Dr. Witham that he did not abuse alcohol. (R. at 155.) The report states that McDonald injured his back by slipping on ice fifteen years prior, and that he has not worked since then. (R. at 156.)

Dr. Ronald Goldberg saw McDonald and conducted a similar disability evaluation on August 12, 2005. (R. at 152–53.) The report states that McDonald has had "chronic low back pain of 14 years" due to an injury, and that a motor vehicle accident in 2003 aggravated the injury. (R. at 152.) Dr. Goldberg also stated that McDonald last worked as a carpenter fifteen years ago but stopped working due to back pain. (R. at 152–53.) He did not address any mental health conditions. (R. at 152–53.) Dr. Goldberg concluded that with successful pain management treatment, "there would be no medical contraindication for full-time sedentary employment." (R. at 153.)

Eisenman, the social worker who had seen McDonald regularly since November 2005, provided a one-page letter dated February 15, 2007, in support of McDonald's Social Security application. (R. at 335.) She concluded that "McDonald has experienced symptoms severe enough to keep him from working for the past 24 years. For most of that period, he was not in formal treatment, but self-medicated with alcohol." (R. at 335.) Eisenman based

her determination on "hospital documents and records of his treatment for his suicide attempt and depression in 1983" and the symptoms he currently presents, which "Mr. McDonald reports . . . have been present ever since his initial suicide attempt in 1983." (R. at 335.) In a shorter letter of the same month, Eisenman gave her diagnosis as "major depression, recurrent" and stated that McDonald had reported at his initial interview that he had suffered severe emotional symptoms for twenty years.[3] (R. at 336.)

Rachel York, the registered nurse who prescribes McDonald's medications at Arbour Counseling Services, reported that he "has been unable to work for many years due to the severity of his symptoms." (R. at 338.) She also reports that he "is coping with chronic physical pain from old work related injuries." (R. at 338.)

On February 12, 2007, Dr. William Krueger conducted another disability evaluation of McDonald for the Commonwealth. (R. at 340-43.) In addition to discussing McDonald's chronic pain, Dr.

---

[3]The initial interview form lists "2 yrs +" as the onset of his depressive symptoms and notes that he had prior mental health treatment more than twenty years prior. (R. at 289.) There is an important inconsistency between "2 yrs+" and twenty years. The "2 yrs+" could date approximately back to the 2003 car accident that reaggravated McDonald's back injuries, and would correspond with the reports of Dr. Caneris, who reported that McDonald's depression started after the motor vehicle accident. (R. at 247-48, 289.) Twenty years could date back to before he was last eligible to claim Social Security benefits.

Krueger noted that McDonald "reports a history of depression and anxiety." (R. at 340.) In addition to the 1983 suicide attempt "trigger[ed]" by "marital conflicts," Dr. Krueger states that McDonald reported a second suicide attempt, "8 or 9 years ago," when he overdosed but woke up the next day and was not hospitalized or treated. (R. at 340.) McDonald reported that he only drinks on social occasions and "has never been a heavy drinker" (R. at 341) and that he stopped working in the 1980s (R. at 343). Dr. Krueger diagnosed McDonald with "major depression," "anxiety disorder, not otherwise specified," "panic disorder without agoraphobia," and stated that he "is not able to work due to herniated discs, reports depression keeps him from working." (R. at 343.)

### 5. Non-Examining Opinions

The SSA arranged two psychiatric reviews of McDonald's file, one dated June 22, 2006, and the other dated November 28, 2006. (R. at 269-83, 319-33.) In both decisions, the reviewing physicians determined that there was insufficient evidence to make a medical disposition regarding McDonald's condition as of December 31, 1986. (R. at 269, 319.) The second review, conducted by Dr. D. Levoy, stated, "there are no psych sources for info reflecting the [date last insured] period, and the prior sources fr[om] 83 to 84 suggest alcohol-associated episodes and a mention of situational depression for which he was not treated

with antidepressants.  There is no evidence establishing adequate
duration even to the alcohol and situational depression, nor is
th[e] severity clear, nor the mental status even back then."  (R.
at 331.)  Dr. Levoy also noted the inconsistencies in McDonald's
reported work history and the discrepancy between the Arbour
Counseling Services reports regarding the duration of his
depression and medical reports indicating that McDonald had not
suffered from depression until after his 2003 car accident.  (R.
at 331.)

### 6.  Hearing Testimony

At the December 6, 2007, hearing, the ALJ heard testimony
from an impartial medical expert, Dr. Louis Sorrentino, and an
impartial vocational expert, Amy Versilla.

Sorrentino, a board certified psychiatrist, reviewed
McDonald's medical record, including exhibits submitted shortly
before the hearing, and concluded that McDonald suffers from
three listed impairments: affective disorders (12.04), anxiety
disorders (12.06), and substance addiction (12.09).  (R. at
50-52.)  With respect to the alcohol addiction, he stated
"[t]hat's not very relevant" and that the "alcohol disorder has
been mainly to relieve his symptoms of severe depression and
anxiety."  (R. at 52-53.)  Dr. Sorrentino concluded that
McDonald's depression was "severe" and that the anxiety disorder
includes "severe panic attacks occurring at least once a week."

(R. at 53.) McDonald's impairments, Dr. Sorrentino testified, affect concentration and social interaction and he has had two suicide attempts. (R. at 53-54.)

When asked by the ALJ to supply citations to the record to support his findings, Dr. Sorrentino referred to Eisenman's notation that McDonald's GAF score was 35 and "[t]he psychiatrist that reviewed his case — trying to find the quote. He has — says he has a long history of depression that's gotten worse since the '80s with chronic symptoms of depression since that time." (R. at 54.) Dr. Sorrentino also cited McDonald's herniated discs and that he is presently prescribed medications. (R. at 54.) Dr. Sorrentino maintained that McDonald was consistently suffering severe mental and physical impairments since the date last insured, citing the September 22, 2004, report from Dr. Caneris. (R. at 56.) When confronted with Dr. Caneris's notation, in the same report, that McDonald had not had depressive symptoms prior to the 2003 car accident, Dr. Sorrentino struggled to find the notation even after successfully locating the correct page. (R. at 61-63.) He then questioned the completeness of Dr. Caneris's medical history, suggesting that Eisenman's reports are more complete. He observed that "the social worker felt his depression went way back," although he admitted that her reports were based entirely on self-reporting by McDonald. (R. at 63.)

The ALJ also questioned Dr. Sorrentino extensively about the effects of McDonald's alcohol abuse. Dr. Sorrentino suggested that McDonald may have suffered brain damage from his alcohol abuse, but admitted that there was no medical evidence of any such damage. (R. at 57.) Dr. Sorrentino also stated that the alcohol could have been a contributing factor to his depression. (R. at 57.)

Versilla, a vocational rehabilitation counselor, testified that, as of 1986, McDonald could have performed all past relevant work other than driving a cab without exertional limitations. (R. at 68.)

### 7. ALJ's Decision

The ALJ found that McDonald was not engaged in substantial gainful employment from December 31, 1986, and that he had a medical determinable impairment of situational depression as of that time. (R. at 77.) However, the ALJ determined that McDonald's situational impairment did not significantly limit his ability to work for twelve consecutive months and, consequently, was not "severe" within the meaning of the Social Security Act. (R. at 77.) The ALJ thus concluded that there was no evidence of a disability as defined in the Social Security Act as of December 31, 1986. (R. at 81.)

The ALJ determined that although McDonald's current impairments are severe and disabling, "with the exception of the

14

claimant's testimony that he was treated by Dr. Bahrawy for about one year following [the 1983] suicide attempt, there is no longitudinal medical evidence of any mental impairment prior to December 31, 1986 other than situational depression, the diagnosis offered on discharge March 15, 1983." (R. at 79.) The next documented evidence of treatment was in 2005. (R. at 79.) The ALJ also noted that there was record evidence that McDonald was "well able to function" following his 1983 suicide with only "mild limitations in the areas of activities of daily living, social functioning and concentration, persistence and pace." (R. at 80.) The ALJ concluded that the medical evidence suggested that his "suicide attempt in January of 1983 was related to alcohol abuse and that his depression was situational in nature." (R. at 81.)

In assessing the record before him, the ALJ found McDonald lacked credibility due to "his demeanor at the hearing, the glaring inconsistencies between his testimony and the documentary record and his unwillingness to answer questions in a forthright manner." (R. at 81.) He gave Dr. Sorrentino's testimony "little weight as upon further questioning it became clear that Dr. Sorrentino was not familiar [with] many of the details contained in the medical record. Further, he was unable to provide references to support his opinion. Additionally, Dr. Sorrentino stated that 12.09 [alcohol abuse] was not relevant which is also

at odds with Regulations as it appears the claimant had a significant drinking problem in the 1980's [*sic*]." (R. at 79.) The ALJ likewise found the reports of the Arbour Counseling Services clinicians "of limited weight" because "neither of these clinicians treated the claimant prior to 2005 and both relied heavily on the claimant's self-reporting in their durational assessments," and because it was not clear that they reviewed the complete medical records. (R. at 81.) By contrast, the ALJ gave the SSA's non-examining psychiatrists' reports "significant weight as it reflects a reasoned judgment based on all of the available evidence of the record." (R. at 81.)

## II. STANDARD OF REVIEW

My review of the Commissioner's decision on disability is limited. Although I may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing," the Commissioner's factual findings are treated as conclusive so long as they are "supported by substantial evidence." 42 U.S.C. § 405(g). Thus, I must uphold the ALJ's findings if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (*per curiam*) (citation omitted).

Because the ALJ is tasked with making credibility determinations and drawing inferences from the record, if substantial evidence exists, I must defer to the ALJ's finding "even if the record arguably could justify a different conclusion." *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (*per curiam*) (citation and quotation marks omitted). However, even if deference is due to the ALJ's factual findings, I "may review conclusions of law . . . and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to the experts.'" *Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001) (quoting *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (*per curiam*) (additional citations omitted). Consequently, I must consider "whether the final decision is supported by substantial evidence and whether the correct legal standard was used." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

### III. DISCUSSION

In seeking disability benefits, a claimant "bears the initial burden of establishing through credible evidence, that he was disabled within the meaning of the Social Security Act." *Musto*, 135 F. Supp. 2d at 220; *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 7 (1st Cir. 1982). An individual is considered disabled if he is unable "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The SSA has established a five-step sequential evaluation process to determine whether a claimant is disabled and thereby eligible for disability benefits. 20 C.F.R. § 404.1520. The ALJ must determine (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether that impairment falls within the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant has the residual functional capacity to perform past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience. *Id.* In making this determination, the ALJ must consider the record as a whole, but is "not at liberty to substitute his own impressions of an individual's health for uncontroverted medical opinion." *Carillo Marin v. Sec'y of Health & Human Servs.*, 758 F.2d 14, 16 (1st Cir. 1985) (*per curiam*).

The ALJ found that McDonald's claim failed at the second step of this inquiry because his impairment was not "severe" as defined by the Social Security Act. (R. at 81.)

## A. McDonald's Insured Status

McDonald's Social Security claim is complicated by his distant date last insured. In addition to demonstrating disability, a claimant must also meet the "insured status" requirement of 42 U.S.C. § 423(a)(1). *Coughlin v. Astrue*, No. 09-30217, 2010 WL 4225380, at *2 (D. Mass. Oct. 20, 2010) ("An individual is entitled to SSDI benefits if, among other things, she has an insured status and, prior to the expiration of that status, was under a disability. 42 U.S.C. § 423(a)(1)(A) and (D)."). If the claimant no longer meets that requirement — *i.e.*, no longer makes sufficient contributions to the SSA via payroll taxes or otherwise — in order to be eligible for benefits, he must demonstrate that "prior to the expiration of that status, [he] was under a disability that lasted, or could be expected to last, for a continuous period of at least twelve months." *Resendes v. Astrue*, — F. Supp. 2d —, 2011 WL 669090, at *1 (D. Mass. Feb. 17, 2011) (citing 42 U.S.C. § 423(a)(1)(A) and (C)).

The parties agree that McDonald's date last insured is December 31, 1986. (R. at 17.) Consequently, he bears the burden of establishing that he was disabled, within the meaning of the Social Security Act, by that date. In his application for

benefits, McDonald listed December 31, 1986, as the onset date for his disability. (R. at 136.) The relevant time period for assessing McDonald's mental and physical impairments, therefore, is January 31, 1986, through January 31, 1986.[4] *See Resendes*, 2011 WL 669090, at *1.

## B. ALJ's Failure to Credit Medical Expert's Testimony

The claimant bears the burden at step two in the sequential evaluation process of demonstrating the severity of his impairment. 20 C.F.R. § 404.1520(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."). An impairment is not severe if it does not significantly limit a claimant's ability to do basic work activities. 20 C.F.R. § 404.1521(a).

---

[4]During the hearing, McDonald's counsel argued that the onset of McDonald's disability was "immediately upon the occurrence of his . . . attempted suicide in January 1983" and that this disability has been ongoing and uninterrupted since that date. (R. at 19.) Although McDonald's application for benefits suggests that the relevant time period for considering his impairments is as of the date last insured, the argument made at the hearing suggests a relevant time period of January 29, 1983, to December 31, 1986. *See Resendes*, 2011 WL 669090, at *12; *see also Coughlin*, 2010 WL 4225380, at *2. Because the ALJ thoroughly considered McDonald's mental impairments during this extended period — particularly the suicide attempt as the only contemporaneous medical evidence of McDonald's mental impairment before the expiration of the date last insured — I am satisfied that any potentially relevant time period has been properly considered by the ALJ despite McDonald's inconsistent approach to the relevant time of disability.

When there are inconsistent medical opinions in a claimant's case record regarding the severity of a claimant's purported disability, the SSA "will weigh all of the evidence and see whether [it] can decide whether [claimant is] disabled based on the evidence" the SSA has. 20 C.F.R. § 404.1527. The SSA gives "more weight" to medical opinions in which the source provides a better explanation for that opinion, or in which the opinion is more consistent with the record as a whole. 20 C.F.R. §§ 404.1527(d)(3)-(4).

McDonald argues that the ALJ's decision that his mental impairment was not severe is not supported by substantial evidence because the ALJ wrongly dismissed the opinion of the impartial medical expert, Dr. Sorrentino. The ALJ gave Dr. Sorrentino's testimony "little weight" because "upon further questioning it became clear that Dr. Sorrentino was not familiar [with] many of the details contained in the medical record. . . . [and] he was unable to provide references to support his opinion." (R. at 79.)

The transcript of the hearing provides substantial support for the ALJ's determination. For example, Dr. Sorrentino was unaware of Dr. Caneris's report stating that the depressive symptoms began only after the 2003 accident, he originally stated that the alcohol abuse was "not very relevant" and then asserted without any record support that McDonald may have sustained brain

damage due to drinking, Dr. Sorrentino also pointed to the severe

panic attacks — which the reports indicate began after his

father's death in 2005 — as evidence of the severity of

McDonald's anxiety condition in 1986.[5]  (R. at 50-54.)  Dr.

Sorrentino also based his diagnosis of McDonald's condition on

the GAF score of 35 reported by Eisenman on November 3, 2005,

noting that "[u]sually 50 is the cutoff."  (R. at 54.)  However,

the record evidence indicates that McDonald had received higher

GAF assessments contemporaneously and more recently than

Eisenman's.  On July 28, 2005, Dr. Witham listed a GAF of 61 and,

in 2007, Dr. Krueger stated McDonald's GAF was 53.  (R. at

---

[5]The following is an example of Dr. Sorrentino's apparent
confusion regarding the record during the hearing:

Q: Doctor, is it fair to say that the information that
   Dr. Krueger is relying on is the report of the Claimant
   himself?

A: Krueger is —

Q: I think that's who you were referring — if that' who
   you were reading from, I thought —

A: Yeah.

Q: — that was the most recent —

A: Yes

Q: — document.  Okay, Doctor, is there any evidence of —
   to document the Claimant's depression from — anything
   to document his depression prior to his most recent
   treatment beginning with Arbor Counseling Service?

A: Well, I think some of the depression was there, but
   don't think it was as severe until the attempted
   suicide. . . .

Q: Okay, but is it fair to say, Doctor, there's no
   evidence in the medical — no medical evidence to
   support the diagnosis from 1983 until some treatment
   with Arbor Counseling?

A: Been in treatment, and has kept his appointments and
   taken his medication . . .

(R. at 54-55.)

157–58, 343.)  Dr. Sorrentino also conceded that Eisenman's reports, upon which he relied almost exclusively as support for his medical opinion, were themselves largely based on McDonald's own self-reporting.  (R. at 63.)

McDonald also argues that Dr. Sorrentino's testimony is consistent with all of the other medical evidence except the SSA's non-examining psychiatrists' opinions and is especially consistent with Eisenman's opinions and reports.  McDonald is only partially correct in this assertion.

*First*, Dr. Sorrentino, a non-examining psychiatrist, stated in testimony that he credited Eisenman's opinion over the other reports in the file.  (R. at 63.)  Consequently, that Dr. Sorrentino's testimony is consistent with Eisenman's reports and opinion provides no additional support for Dr. Sorrentino's testimony.  Moreover, as Dr. Sorrentino conceded at the hearing, Eisenman's reports were generated twenty years after the date last insured and are almost exclusively derived from McDonald's self-reporting.  (R. at 56.)

*Second*, while Dr. Sorrentino's testimony is consistent with Eisenman's reports and opinion, his testimony is *inconsistent* with the objective medical evidence in the record.  Dr. Sorrentino's opinion that McDonald's severe mental impairment dated from the 1983 suicide attempt is inconsistent with Dr. Bahrawy's 1983 notation that the diagnosis was "situational

depression" treatable by outpatient therapy and that the apparent trigger for the suicide attempt was marital problems (which is situational in nature). (R. at 212–13.) Other medical reports, including Eisenman's, also note that the suicide attempt was triggered by McDonald's separation from his wife. (R. at 289–96 (Eisenman), 341 (Dr. Krueger).)

Additionally, the medical reports regarding work-related injuries in 1998 and 2002 suggest that any impairment was not severe as of the date last insured. (R. at 228–31, 258–59.) In fact, McDonald completed a worker's compensation evaluation for the injury at a job site in 2002; told Dr. Murdock that he "continues to work but has avoided doing the manual heavy labor and is doing most of his time supervising at the job sites" in 2004; and told Dr. Caneris in 2004 that he had stopped working after the 2003 motor vehicle accident. (R. at 238–40, 247–48, 256–57.) Furthermore, the disability evaluations in 2005, before McDonald's SSDI claim was initially rejected, focus on his back pain. (R. at 152–53, 157–58.) Dr. Goldberg's evaluation does not mention depression, and Dr. Witham's evaluation describes his depression as "chronic and fairly mild in nature" and arising "shortly after his original back injury about 15 years ago." (R. at 152–53, 157.)

Thus, Eisenman and Dr. Sorrentino's testimony regarding the severity and duration of McDonald's depression are inconsistent

with the medical record.[6]  Consequently, while McDonald is

correct that the ALJ may not dismiss "uncontroverted medical

opinion," *Carillo Marin*, 758 F.2d at 1, the medical evidence in

the record indicates that Dr. Sorrentino's opinion is not

uncontroverted.  It was therefore not error for the ALJ to give

the testimony of Dr. Sorrentino — and Eisenman — little weight.

*See Ramos v. Barnhart*, 119 Fed. Appx. 295, 296 (1st Cir. 2005)

(*per curiam*) (concluding that the "ALJ was justified in according

the treating psychiatrist's report little weight" where the

physician's opinion was "inconsistent with the bulk of the

medical evidence and [wa]s not supported by any progress notes or

clinical or laboratory findings").  Given the lack of evidence of

any mental impairment between 1983 and 2004, based on the record

---

[6]McDonald argues that the ALJ also erred in granting
"significant weight" to the non-examining reviews of the SSA's
psychiatrists because they did not have a full record.  Dr. Stone
and Dr. Levoy conducted their reviews on June 22, 2006, and
November 28, 2006, respectively.  (R. at 269–83, 319–33.)  While
Dr. Stone's report simply stated that there was insufficient
evidence to support a medical disposition as of December 31,
1986, Dr. Levoy provided additional notations citing to the
record evidence, including the hospital reports from the 1980s.
(R. at 331.)  Dr. Levoy observed that the hospital reports from
the 1980s noted involvement of alcohol and only one mention of
situational depression in 1983.  (R. at 331.)  The record
evidence that Dr. Levoy did not review were the opinions of
Eisenman, York, and Dr. Krueger, which were based entirely on
McDonald's self-reporting and, with the exception of the
additional suicide attempt reported by Dr. Krueger, did not
provide any additional medical information.  (R. at 335–43.)
Thus, there is substantial evidence supporting the ALJ's
determination that Dr. Levoy's conclusions were credible.

as a whole, I am satisfied that the ALJ's decision was supported by substantial evidence.

## C.  Social Security Regulation 83-20

Social Security Regulation 83-20 ("SSR 83-20") provides guidelines for determining the onset date of a disability. Ruling 83-20, *Titles II and XVI: Onset of Disability*, 1983 WL 31249 (SSA 1983).  SSR 83-20 defines the onset date of a disability as "the first day an individual is disabled as defined in the Act and the regulations."  SSR 83-20, 1983 WL 31249, at *1.  Three factors are relevant to a determination of an onset date: the individual's allegations, work history, and medical evidence.  *Id.* at *2.  According to SSR 83-20, "medical evidence serves as the primary element in the onset determination."  *Id.* When "the alleged onset and the date last worked are far in the past and adequate medical records are not available[,] . . . it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process."  *Id.*  SSR 83-20 further states that "[w]hen the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy.  However, the established onset date must be fixed based on the facts *and can never be inconsistent with the medical evidence of record.*"  *Id.* at *3 (emphasis added).

McDonald argues that the ALJ abused his discretion by failing to comply with SSR 83-20. He cites two alleged errors. The first is that the ALJ substituted his own view of the medical evidence for that of Dr. Sorrentino, the medical expert called pursuant to SSR 83-20. This argument is duplicative of his unsuccessful first argument regarding the weight afforded Dr. Sorrentino's testimony. Consequently, I need not repeat myself here. *See supra* Part III.B. McDonald next contends that the ALJ erred by not exploring alternative sources of information when he concluded that there was a "lack of longitudinal evidence" supporting a finding of disability as of December 31, 1986.

It should first be noted that the ALJ was not under any obligation to apply SSR 83-20 in this case. "[A] determination concerning the onset of disability does not need to be made unless an individual has been determined at some point to have been disabled during the insured period." *Biron v. Astrue*, No. 09-40084, 2010 WL 3221950, at *6 (D. Mass. Aug. 13, 2010). Thus, if, as here, the ALJ finds that the claimant was not disabled during the relevant period, there is no requirement that the ALJ determine the onset date. *See, e.g.*, *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004); *Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 776 (11th Cir. Aug. 6, 2010) (*per curiam*); *Key v. Callahan*, 109 F.3d 270, 273-74 (6th Cir. 1997) (concluding that when there is no finding of disability, "[t]he only

necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status"); *see also Cohen v. Barnhart*, 61 F. App'x 722, 722 (1st Cir. 2003) (*per curiam*) (finding compliance with SSR 83-20 unnecessary where the purported disability, "as of the date of his application for disability benefits, had not yet reached a level of severity that would in itself preclude him from performing his past relevant work . . . ., and that, accordingly, appellant's mental impairment was not in itself severe enough to be disabling as of the much earlier [date last insured]").

SSR 83-20 may provide a helpful rubric for determining whether a disability existed prior to the date last insured. *See Blanda v. Astrue*, No. 05-CV-5723, 2008 WL 2371419, at *14 (E.D.N.Y. June 9, 2008) ("[T]he most logical interpretation of SSR 83-20 is to apply it to situations where the ALJ is called upon to make a retroactive inference regarding disability involving a slowly progressive impairment, and the medical evidence during the insured period is inadequate or ambiguous."). Here, the ALJ in fact did call a medical expert, Dr. Sorrentino, and addressed the three SSR 83-20 factors to that end. Thus, although he was not required to do so, the ALJ complied with SSR 83-20 and, consequently, committed no reversible error. *See Biron*, 2010 WL 3221950, at *6-7.

The ALJ also did not err in failing to develop the record further. The ALJ determined that the medical evidence did not support a finding of disability as of December 31, 1986. (R. at 81.) Consequently, McDonald essentially is "contend[ing] the ALJ should have sought [additional] assistance so that by inference he could reach a conclusion that would be contrary to the medical evidence already before him." *TheLosen v. Comm'r of Soc. Sec.*, 384 F. App'x 86, 91 (3d Cir. 2010). Because the ALJ here "consider[ed] the medical evidence, the consultative reports, and the hearing testimony" to "determine[] that the evidence did not support a finding, at step two of the sequential evaluation, that [McDonald] had a severe impairment at a time that would qualify h[im] to receive . . . benefits," the ALJ "was not required to obtain additional assistance."[7] *Id.*

## D. McDonald's Credibility

Generally speaking, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by

---

[7]McDonald points out that his wife was present at the hearing and could have provided testimony regarding his mental impairment as of the date last insured. However, during the hearing, McDonald's counsel "made the decision not to offer Mrs. McDonald as a witness, as her testimony would have been redundant." (Pl.'s Mem. at 17.) Given the potential testimony's redundant nature, and that McDonald contemplated but chose not to offer it, the ALJ cannot be faulted for failing to require or seek it.

specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (*per curiam*). However, in making a credibility determination, the ALJ must consider six prescribed factors:

> (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of the medical symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness and side effects of any medication, (5) treatment other than medication the claimant receives, (6) measures claimant uses for pain relief, and any other functional limitations and restrictions due to the claimant's impairments.

20 C.F.R. § 416.929(c)(3). "Then, in assessing the credibility of a claimant's complaints . . ., the ALJ must consider whether, in light of [these] factors, h[is] complaints are consistent with the objective medical evidence and other evidence in the record." *Arnold v. Astrue*, No. 10-10429, 2011 WL 2940718, at *5 (D. Mass. July 19, 2011) (citations omitted).

McDonald contends that the ALJ did not thoroughly or properly evaluate his credibility because he relied on a few purported inconsistencies in his testimony and did not give sufficient consideration to his medications and prior alcohol abuse. However, the ALJ's decision and his questioning at the hearing demonstrate that he thoroughly considered the required factors and, in light of McDonald's inconsistent statements, found him to lack credibility. (R. at 79-80.)

A "strong indication of the credibility of an individual's statements is their consistency, both internally and with other

30

information in the case record." Ruling 96-7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *5 (SSA 1996). McDonald's testimony and statements to various healthcare providers, as evidenced in the hospital and other medical reports, are laden with inconsistencies. In particular, the ALJ noted (1) McDonald's failure to fully represent his criminal history when directly asked; (2) his assertion that he had not worked since 1985 due to herniated discs despite record evidence that he had worked in construction after the date last insured; (3) his denials that those same hospital reports documenting work were accurate or even his; and (4) his failure to disclose his previous alcohol abuse to Dr. Krueger. (R. at 80.)

*First*, although the record indicates that he had been convicted of intimidating a witness, resulting in a five-month sentence, McDonald reported only a two-month sentence for driving under the influence; he admitted to the witness intimidation conviction and sentence only after prompting from his attorney. (R. at 23, 46; *see also* R. at 155 (reporting disability evaluation interview of Aug. 4, 2005, in which McDonald reported both convictions).)

*Second*, the record includes several medical reports that suggest that McDonald worked — albeit irregularly — after both his suicide attempt in 1983 and the date he claims to have

stopped working, 1985.  (R. at 228–31 (Mar. 7, 1998), 238–40 (Jan. 28, 2004), 258 (June 19, 2002).)  Soon after he was treated for contusions due to falling down an embankment at work on June 19, 2002, Merrimack Valley Hospital completed an Occupational Health Workman Compensation Initial Visit evaluation on June 27, 2002.  (R. at 256–57.)  There is also a report from Bon Secours Hospital of a work-related injury due to lifting in what appears to be October 1984, which is after McDonald's suicide attempt. (R. at 205.)  Additionally, he is listed as a self-employed construction worker on records from various hospitals, once listing as employer D&B Construction at his own address in 1992. (R. at 247–50 (New England Neurological Associates, 2004), 261 (Hale Hospital, 1992), 263 (Lawrence General Hospital, 1986), 256 (Merrimack Hospital, 2002), 260 (Hale Hospital, 1996).)  That the ALJ found that McDonald had no substantial gainful employment as of December 31, 1986, is not inconsistent with his finding that McDonald worked occasionally as a self-employed construction worker.

*Third*, the record evidence is inconsistent with McDonald's testimony at the hearing regarding why the records reflect some work history.  The appropriate changes in personal information (residential and employer address) and number of hospitals involved cast doubt on his explanation that the records used old occupational information from his 20s without being updated.  The

use of his own birth date and age on the report from Holy Family Hospital from 1998 — where he was treated for a rash after coming into contact with shrubbery while putting up siding — and the fact that he has never questioned the authenticity of the Holy Family report previously provides evidence to support the ALJ's finding that McDonald's explanation that it was not a report about him was inaccurate. (R. at 25–26.)

*Fourth*, the medical records are also replete with incidents involving alcohol and a history of alcohol abuse. (R. at 205 (blackout due to alcohol), 212 (1983 suicide attempt), 214 (alcohol on breath when seen for BB gun shot to head), 258 (hospital report listing approximately thirty drinks per week), 289–96 (Arbour Counseling Services' Initial Clinical Evaluation).) Indeed, the impact of McDonald's alcohol abuse was discussed at length during the hearing — both during McDonald's and Dr. Sorrentino's testimony — and forms an integral basis for his disability claim (*i.e.*, that he did not seek treatment for his depression until 2005 because he was self-medicating with alcohol). (R. at 34–37, 57.) Nevertheless, on several occasions, McDonald told treating or examining doctors that he had no history of heavy drinking or alcohol abuse. (R. at 155 (disability evaluation of Aug. 4, 2005), 247–48 (report of Dr. Caneris, Sept. 22, 2004), 341 (report of Dr. William Krueger,

Feb. 12, 2007).)  These inconsistent representations provide a substantial basis to question McDonald's credibility.

*Finally*, insofar as McDonald contends that the ALJ did not consider the impact of McDonald's medications, potential side effects, and alcohol abuse in determining his credibility, his contention is without merit.  Although the ALJ did not explicitly discuss the relevance of these factors in his reasoning regarding credibility, the ALJ considered the influence and effects of McDonald's alcohol abuse in great detail during the hearing, including considering the possibility of permanent brain damage and the use of alcohol as self-medication.  (R. at 34-37, 45, 56-64.)  Testimony was also heard regarding McDonald's current symptoms, such as social withdrawal, sleeplessness, lack of concentration, panic attacks, poor memory, and lack of appetite.  (R. at 39-40, 43-4.)  Reference was also made to the list of medications that McDonald currently takes, which is found in the record.  (R. at 28, 54.)

While the ALJ must consider all of the relevant factors, "as a matter of law, the ALJ is not required to address all of the [required] factors in his decision." *Matos v. Astrue*, — F. Supp. 2d —, 2011 WL 2648446, at *6 (D. Mass. 2011) (citing *Nat'l Labor Review Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 26 (1st Cir. 1999)); *see also Shields v. Astrue*, No. 10-10234, 2011 WL 1233105, at *11 (D. Mass. Mar. 30, 2011) ("[T]here is no

requirement that he make specific findings regarding each of the factors in his written decision." (citations omitted)). All that is required is that the ALJ's "determination or decision must contain specific reasons for the findings on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Ruling 96-7p, 1996 WL 374186, at *4. The ALJ's decision "contain[s] specific reasons for the findings on credibility" and there is substantial evidence in the record to support those findings.

Thus, viewing the record as a whole, I find the ALJ had substantial evidence to support his adverse credibility determination.

### IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Defendant's motion (Doc. No. 17) to affirm and DENY McDonald's motion (Doc. No. 12) for Judgment on the Pleadings in his favor.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE